T.C. Memo. 2000-392


UNITED STATES TAX COURT


ESTATE OF ROBERT V. SCHULER, DECEASED, JAY SCHULER & THOMAS
SCHULER, CO-PERSONAL REPRESENTATIVES, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14002-99.          Filed December 28, 2000.


Richard E.T. Smith, Jon J. Jensen, and Garry A. Pearson, for
petitioner.

Tracy Anagnost Martinez and Melissa J. Hedtke, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  Respondent determined a deficiency of $215,758
in the Federal estate tax due from the estate of Robert V.
Schuler (decedent).

After concessions,[1] the sole issue for decision is whether decedent's transfers of stock in 1994 and 1995 to members of his brother's family were, in substance, indirect gifts of stock to members of his own family.  We hold they were.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found, unless otherwise noted.  The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.  Decedent died testate on October 4, 1995, in Wahpeton, North Dakota (Wahpeton).  At the time the petition in this case was filed, the personal representatives of the estate, Jay Schuler and Thomas Schuler, resided in Wahpeton.

All section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references

---

[1]In the notice of deficiency, respondent determined values for certain real properties and a limited partnership interest owned by decedent at the time of his death that decreased the value of the gross estate.  Respondent determined that the value of the taxable estate should be increased for the amount claimed as a charitable deduction which was in excess of the value of the properties contributed to qualified charities, for the unreported value of decedent's brokerage account, and for interest accrued on certain indebtedness owed to decedent.  The estate concedes these adjustments.

The estate attached Schedule J to Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, to claim deductions for $35,000 of attorney's fees, $7,500 of accountant's fees, and $4,400 of miscellaneous expenses.  The parties have stipulated that the estate will incur additional administrative expenses which will further decrease the value of the taxable estate.

are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

The Schuler Family Businesses

Minn-Kota Ag Products, Inc.

At sometime during the late 1930's or early 1940's, the parents of decedent and decedent's brother, George M. Schuler, Jr. (decedent's brother or George), established Schuler Grain Co., a grain elevator business located in the Red River Valley region of west central Minnesota. Decedent and his brother expanded the grain elevator business into a full-service agricultural center by selling farmers seed and fertilizer in the spring and by buying grain from them at harvest time. When chemical supplements became available for agricultural use, decedent and his brother sold the farmers the chemicals. Upon the demise of their parents, decedent and his brother became the owners of the business.

In 1986, Schuler Grain Co. reorganized into a corporation called Minn-Kota Ag Products, Inc. (Minn-Kota). Minn-Kota issued class A voting common stock, all of which was owned by an unrelated employee, and nonvoting noncumulative preferred stock. In 1989, all of the Minn-Kota voting common stock was acquired by George's son, George M. Schuler III (Jody), and the preferred stock converted into restricted class B common stock, which was owned by decedent, decedent's son, Jay Schuler (Jay), George, and

Jody.

### Sigco Sunplant, Inc.

In 1970, decedent, George, and their mother, Dorothy, formed Sigco Sunplant, Inc. (Sigco). Sigco is engaged in the sunflower seed business. Upon Dorothy's demise, Sigco was owned equally by decedent and his brother.

### The Plan and the Stock Transfers

Decedent had heart disease, had undergone heart bypass surgery, and had suffered seven heart attacks, most of them before the transfers at issue. Decedent had seven children, his brother has six children, and many of both men's children have children. In discussions with their insurance agent, Dave Middaugh (Mr. Middaugh), decedent and his brother made it clear that they wanted their families to succeed them in the businesses, and that they wanted decedent's family to control Sigco and George's family to control Minn-Kota.

After many discussions, decedent, his brother, and Mr. Middaugh devised a three-step plan to transfer divided ownership of Sigma and Minn-Kota to each other's family and to use section 2503(b) to save estate taxes.

The first step to transfer the Sigco stock was for decedent and his wife to make joint gifts of Sigco stock equal to $20,000 of value to their children and grandchildren during December 1994 and January 1995. The second step was for George and his wife to

duplicate the first step; that is, to make joint transfers of Sigco stock equal in value to $20,000 to each of decedent's children and grandchildren. The third step in their scheme was for certain of decedent's children to transfer the shares that they had received to four of their siblings, including to Jay and his children.[2]

The first step to transfer the Minn-Kota stock was for George and his wife to make joint gifts of Minn-Kota stock valued at $20,000 to each of their children and grandchildren in December 1994 and January 1995. The second step was for decedent and his wife to duplicate the first step; that is, to transfer in each year $20,000 of Minn-Kota stock to George and his wife and their children. The third step was for certain of George's children and their spouses to transfer the stock in amounts equal in value to $10,000 to Jody and his wife, Holly, and to their children, George M. Schuler IV (George IV) and William.[3]

1994 Transfers of Sigco Stock

On December 28, 1994, in addition to transferring shares of

---

[2]Mr. Middaugh's notes with respect to this plan stated that the "IRS could claim Step 3 is a step transaction - would be highly likely if 1) there was a written agreement to do so, and 2) if it was done at the same time. Suggest it be voluntary and at the end of 1995 at earliest." The third step had not been executed at the time of trial.

[3]Mr. Middaugh made a note similar to the one in supra note 2 with respect to this step of the scheme. At the time of trial, "Step 3" had not been executed.

Sigco stock to his children and their spouses and children, decedent transferred[4] shares to his brother's son and his family, as follows:

| Transferee | Relationship of Transferee to Decedent | Number of Shares | Value of Shares |
|---|---|---|---|
| Jody | Nephew | 2.22 | $19,980 |
| Holly Schuler (Holly) | Niece by marriage | 2.22 | 19,980 |
| George IV | Grandnephew | 1.81 | 16,290 |
| Total | | | 56,250 |

On that same day, in addition to transferring shares of Sigco stock to Jody and his wife and their children, George transferred shares to decedent's children and their spouses, as follows:

| Transferee | Relationship of Transferee to Decedent | Number of Shares | Value of Shares |
|---|---|---|---|
| Jay | Son | 2.22 | $19,980 |
| Thomas | Son | 2.22 | 19,980 |
| Jennifer | Daughter-in-law | 2.22 | 19,980 |
| Cynthia Deal | Daughter | 2.16 | 19,440 |
| Mike Deal | Son-in-law | 2.16 | 19,440 |
| Constance Waibel | Daughter | 2.22 | 19,980 |
| Christine Haire | Daughter | 2.22 | 19,980 |
| Kathleen Deal | Daughter | 2.22 | 19,980 |
| Karen Steinborn | Daughter | 2.16 | 19,440 |
| Kyle Steinborn | Son-in-law | 2.16 | 19,440 |
| Total | | | 197,640 |

### 1994 Transfers of Minn-Kota Stock

On December 28, 1994, decedent transferred shares of Minn-

---

[4]Decedent's wife consented to have the transfers (including generation-skipping transfers) made by decedent during 1994 considered as made one-half by each. See sec. 2513(a).

Kota stock to his brother and his brother's family, as follows:

| Transferee | Relationship of Transferee to Decedent | Number of Shares | Value of Shares |
|---|---|---|---|
| George | Brother | 542 | $19,999.80 |
| Barbara | Sister-in-law | 542 | 19,999.80 |
| James | Nephew | 542 | 19,999.80 |
| Jerome | Nephew | 542 | 19,999.80 |
| Kim | Nephew | 542 | 19,999.80 |
| Jan McCann | Niece | 542 | 19,999.80 |
| Francine Cook | Niece | 542 | 19,999.80 |
| George IV | Grandnephew | 325 | 11,992.50 |
| William | Grandnephew | 325 | 11,992.50 |
| Total | | | 163,983.60 |

Although George transferred shares of Minn-Kota to his children and to his children's families on this same day, George did not transfer any shares of Minn-Kota to any members of decedent's family.

### 1995 Transfers of Sigco Stock

On January 3, 1995, in addition to transferring shares of Sigco to members of his own family, decedent made the following transfers[5] to members of his brother's family:

| Transferee | Relationship of Transferee to Decedent | Number of Shares | Value of Shares |
|---|---|---|---|
| Jody | Nephew | 2.22 | $19,980 |
| Holly | Niece by marriage | 2.22 | 19,980 |
| William | Grandnephew | 1.81 | 16,290 |
| Total | | | 56,250 |

On the same day, George made the following transfers of

---

[5]Decedent's wife consented to have the transfers (including generation-skipping transfers) made by decedent during 1995 considered as made one-half by each.  See sec. 2513(a).

Sigco stock to decedent's family:

| Transferee | Relationship of Transferee to Decedent | Number of Shares | Value of Shares |
|---|---|---|---|
| Jay | Son | 2.22 | $19,980 |
| Thomas | Son | 2.22 | 19,980 |
| Jennifer | Daughter | 2.22 | 19,980 |
| Cynthia Deal | Daughter | 2.00 | 18,000 |
| Mike Deal | Son-in-law | 2.00 | 18,000 |
| Karen Steinborn | Daughter | 1.89 | 17,010 |
| Kyle Steinborn | Son-in-law | 1.89 | 17,010 |
| Constance Waibel | Daughter | 2.06 | 18,540 |
| Christine Haire | Daughter | 2.00 | 18,000 |
| Kathleen Deal | Daughter | 2.00 | 18,000 |
| Total | | | 184,500 |

### 1995 Transfers of Minn-Kota Stock

On January 3, 1995, decedent made transfers of Minn-Kota to his brother's family, as follows:

| Transferee | Relationship of Transferee to Decedent | Number of Shares | Value of Shares |
|---|---|---|---|
| George | Brother | 542 | $19,999.80 |
| Barbara | Sister-in-law | 542 | 19.999.80 |
| James | Nephew | 542 | 19.999.80 |
| Jerome | Nephew | 542 | 19.999.80 |
| Kim | Nephew | 542 | 19.999.80 |
| Francine Cook | Niece | 542 | 19.999.80 |
| Jan McCann | Niece | 542 | 19.999.80 |
| George IV | Grandnephew | 325 | 11,992.50 |
| William | Grandnephew | 325 | 11,992.50 |
| Total | | | 163,983.60 |

On the same day, George made transfers of Minn-Kota stock to his own family; however, he transferred no shares of Minn-Kota to decedent's family.

Before making the December 28, 1994, and January 3, 1995, transfers at issue, decedent and his son owned 75 percent of the Sigco shares outstanding (decedent owned 25 percent and Jay owned

50 percent) and George owned the other 25 percent. Additionally, decedent and his family collectively owned 50 percent of the Minn-Kota class B common shares (decedent owned 49.6 percent and his family owned 0.4 percent), and George and his family owned the other 50 percent. Jody owned 100 percent of the Minn-Kota class A voting common stock.

After the transfers, decedent's family owned almost 80 percent of Sigco, and George's family owned almost 68 percent of Minn-Kota. Jody continued to own all of the Minn-Kota voting common stock.

Before making these transfers, in which decedent transferred stock valued at $440,467.20 to his brother's family and George transferred stock valued at $382,140 to decedent's family, neither brother had ever transferred any Sigco or Minn-Kota stock to the other's family. George transferred 540 shares of Minn-Kota stock to decedent's son, Jay, on December 18, 1996, January 2, 1997, and January 2, 1998.[6] The value of the stock in each of these transfers was $19,926. George made no transfers of stock to any other members of decedent's family during this time.

---

[6]The parties stipulated that George made no transfers of stock to decedent's children after 1995. However, the parties agree that stipulation is incorrect and that George made these transfers to Jay at these times.

OPINION

Respondent determined that decedent's transfers of Sigco and Minn-Kota stock during 1994 and 1995 to his brother's family were reciprocated or "crossed" and, in substance, gifts to decedent's own children and their families. Accordingly, respondent disallowed the annual exclusions for gifts of a present interest for decedent's transfers of stock to his brother's family and increased the amount of taxable gifts reported on decedent's estate tax return.

The estate contends that respondent's determination is erroneous because the transfers at issue were made for a business purpose, and decedent's intent in making the transfers was donative.

Section 2001(a) provides that a tax is imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. The tax imposed is equal to the excess of a tentative tax computed on the sum of the taxable estate and the adjusted taxable gifts over the aggregate amount of tax that would have been payable with respect to gifts made by the decedent after December 31, 1976, using the unified rate schedule in effect at the date of death. See sec. 2001(b). The term "adjusted taxable gifts" means the total amount of the taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts which are

includable in the gross estate.  See id.

In general, a tax is imposed for each calendar year on the transfer of property by gift by any individual, whether the gift is made directly or indirectly.  See secs. 2501(a), 2511(a).  The term "taxable gifts" means the total amount of gifts made during the calendar year, less certain deductions.  See sec. 2503(a).  However, the first $10,000 of gifts of a present interest in property made by a donor to any person in a calendar year are excluded from taxable gifts.  See sec. 2503(b).

As a general rule, we respect the form of a transaction.  We do not apply the substance over form principles unless the circumstances so warrant.  See Gregory v. Helvering, 293 U.S. 465 (1935); Estate of Jalkut v. Commissioner, 96 T.C. 675, 686 (1991).

The reciprocal trust doctrine, an application of substance over form, has been used in the estate and gift tax area to determine who is the transferor of property for the purposes of inclusion in the gross estate.  See United States v. Estate of Grace, 395 U.S. 316, 321 (1969).  Recently, in Sather v. Commissioner, T.C. Memo. 1999-309, this Court applied the reciprocal trust doctrine to reduce the number of present interest annual exclusions for gift tax purposes.

In United States v. Estate of Grace, supra, Joseph P. Grace created a trust for the benefit of his wife and, 2 weeks later,

his wife created a substantially identical trust for his benefit. In holding that for Federal estate tax purposes each settlor will be considered the creator of the trust that is in form created by the other, the Supreme Court stated:

> It is undisputed that the two trusts are interrelated. They are substantially identical in terms and were created at approximately the same time. Indeed, they were part of a single transaction designed and carried out by decedent. It is also clear that the transfers in trust left each party, to the extent of mutual value, in the same objective position as before. Indeed, it appears, as would be expected in transfers between husband and wife, that the effective position of each party vis-a-vis the property did not change at all. It is no answer that the transferred properties were different in character. For purposes of the estate tax, we think that economic value is the only workable criterion. [Id. at 325.]

In the instant case, the transfers were not made in trust; however, that is a distinction without a difference. "The law searches out the reality and is not concerned with the form." Lehman v. Commissioner, 109 F.2d 99, 100 (2d Cir. 1940), affg. 39 B.T.A. 17 (1939); see also United States v. Estate of Grace, supra at 321. Thus, the same principle and much of the same factors of the reciprocal trust doctrine are considered in the reciprocal transaction doctrine, which applies to reciprocal indirect transfers of a present interest.

For instance, in Furst v. Commissioner, T.C. Memo. 1962-221, this Court found that where six donors each made transfers of shares of stock to members of his or her immediate family, and transfers of the same stock in the same amounts to members of

each other donor's immediate family, the transfers, in reality, gave the members of a donor's family all of the stock that donor transferred. Therefore, we held that the number of annual exclusions would be determined by the number of recipients in each donor's immediate family.

Moreover, in Schultz v. United States, 493 F.2d 1225, 1226 (4th Cir. 1974), the taxpayer transferred stock in a closely held corporation to each of his three children and to each of the three children of his brother. On that same day, the taxpayer's brother transferred the same number of shares to each of his three children and to each child of the taxpayer. The court held, without deciding whether United States v. Estate of Grace, supra, would apply with equal force to indirect gifts, that a reasonable jury could have concluded that the taxpayer intended to benefit his children by the transfers, rather than those of his brother. Accordingly, the court sustained the Commissioner's disallowance of the annual exclusion for gifts the taxpayer claimed for the transfers to his brother's children.

The facts of the instant case prove conclusively that the transfers at issue were reciprocal; that is, decedent's transfers to his brother's family were made in exchange for George's transfers to decedent's family members.

The parties stipulated that the brothers' motivations in making the transfers included the desire to separate ownership of

Sigco and Minn-Kota between the two families and to minimize estate taxes. Clearly, as both decedent and his brother owned stock of both corporations, separation of ownership by exchanging the stock through transfers to each other's family members at least implies reciprocity. The estate asserts, however, that the business purpose for exchanging the stock excepts these transactions from the reciprocal transaction doctrine. We disagree.

The estate contends that the business purpose was to divide the companies and place Jay in control of Sigco and Jody in control of Minn-Kota. Separation of the families' ownership of Sigco and Minn-Kota, insofar as it was accomplished, was not the main purpose of the transfers. Before the transfers, decedent's family owned 75 percent of Sigco; after the transfers, it owned almost 80 percent. Thus, the transfers resulted in little of the Sigco ownership shifting from George's family to decedent's family. Moreover, the estate's contention is proved false by the facts that decedent transferred shares of Sigco in 1994 and 1995 to George's son Jody, and other members of George's family, and George transferred more than 1,600 Minn-Kota shares to decedent's son, Jay, after decedent's death.

Finally, before the transfers at issue, decedent owned 25 percent of the Sigco shares outstanding and Jay owned 50 percent; collectively, a 75-percent majority. Therefore, the transfers at

issue were not necessary for Jay to acquire control of Sigco. Both before and after the transfers, Jody owned 100 percent of the Minn-Kota voting stock and, therefore, controlled Minn-Kota; acquiring control of Minn-Kota for Jody was not the purpose of the transfers.

A business purpose, if any, was not the primary motivation for making the reciprocal transfers at issue. It is an inescapable conclusion that decedent and his brother made the circuitous transfers for the primary purpose of increasing the number of exclusions under section 2503(b) that otherwise would have been available to them.

In United States v. Estate of Grace, supra, the Supreme Court held that application of the reciprocal trust doctrine requires only that the trusts be interrelated, and requires that the arrangement, to the extent of mutual value, leave the settlors in approximately the same economic position as they would have been in had they created the trusts naming themselves as life beneficiaries. In concluding application of the reciprocal trust doctrine does not depend upon a finding that each trust was created as a quid pro quo for the other, the Supreme Court stated:

> We do not mean to say that the existence of "consideration," in the traditional legal sense of a bargained-for exchange, can [n]ever be relevant. In certain cases, inquiries into a settlor's reasons for creating the trusts may be helpful in establishing the requisite link between the two trusts. We only hold

that a finding of a bargained-for consideration is not necessary to establish reciprocity. [United States v. Estate of Grace, 395 U.S. at 325 n.10.]

In this case, the transfers were interrelated. We have no doubt that decedent's transfers of stock to his brother's family were quid pro quo for George's transfers of stock to decedent's family; the exchanged stock was the bargained-for consideration. Furthermore, the brothers' plan to exchange the stock via transfers to each other's families on the same days in 1994 and 1995 establishes that the transfers were reciprocal. See Lehman v. Commissioner, supra at 100-101 ("Here the transfer by the decedent's brother, having been paid for and brought about by the decedent, was in substance a 'transfer' by the decedent".).

The estate contends that decedent was not left in the same economic position after the transfers as his net worth was "severely depleted". The estate misconstrues the reciprocal transaction doctrine. The relevant inquiry in reciprocal indirect transfer cases is whether the transferees are in approximately the same economic position as they would be if the donor transferred the property directly to them. See Schultz v. United States, supra; Furst v. Commissioner, supra. Here, in simultaneous, circuitous transfers, decedent conveyed stock with a total value of $440,467.20 to his brother's family, and George conveyed stock with a total value of $382,140 to decedent's family. The difference in these amounts, $58,327.20, was

eliminated by George's transfer of stock with a total value of $59,778 to decedent's son, Jay, in the 3 years following decedent's death.  Thus, it is clear that decedent's family members received stock of approximately the same economic value via the circuitous route devised by decedent, his brother, and their insurance agent as they would have by direct transfers from decedent.

Finally, the estate asserts that the reciprocal transaction doctrine does not apply to this case because decedent would have made the transfers to his brother's family even if George had made no reciprocal transfers to decedent's family.  We disagree.

We find implausible the estate's assertion that decedent would have transferred gratuitously assets sufficient to severely deplete his net worth.  Moreover, it well settled that the Federal estate tax does not hinge upon the subjective intent of the decedent.  See United States v. Estate of Grace, supra at 323.  Relevant to the decision in this case is that the objective facts prove conclusively that decedent and his brother executed a plan to make simultaneous, reciprocal transfers of property of approximately equal economic value to each other's family members, and that decedent's immediate family members received property of approximately the same economic value as they would

have received if decedent had transferred the property directly to them.

The estate's position has no basis in either fact or law. Accordingly, respondent is sustained on this issue.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.